COURT OF APPEALS
DECISION
DATED AND FILED

September 24, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing.  If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.  *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.  2019AP115**
**2019AP116**
**2019AP117**

Cir. Ct. Nos. 2016TP218
2016TP219
2016TP365

**STATE OF WISCONSIN**

**IN COURT OF APPEALS**
**DISTRICT I**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO A.C.P., Z.H., AND R.R.H., PERSONS UNDER THE AGE OF 18:

STATE OF WISCONSIN,

PETITIONER-RESPONDENT,

V.

K. K. E.,

RESPONDENT-APPELLANT.

APPEALS from orders of the circuit court for Milwaukee County: LAURA GRAMLING PEREZ, Judge.  *Affirmed.*

¶1     DUGAN, J.[1]  K.K.E. appeals the orders terminating her parental rights to her three biological children.[2]   K.K.E. argues that the trial court erroneously exercised its discretion when it concluded that termination of her parental rights was in the best interests of each of her children.[3]  We disagree and, therefore, affirm.

## BACKGROUND

¶2     K.K.E. is the mother of A.C.P., Z.H., and R.R.H.[4]  A.C.P. is a twelve-year-old girl who was born on July 12, 2007; Z.H. is an eleven-year-old girl who was born on August 1, 2008; and R.R.H. is a four-and-one-half year old girl who was born on December 14, 2014.

---

[1] These appeals are decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2017-18).  All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[2] Separate cases were filed for each child and K.K.E. filed a separate notice of appeal in each case.  On July 8, 2019, we issued an order consolidating the appeals.

Although the cases were separate before the trial court, in most instances the parties' papers and court orders in each case were identical, and joint court proceedings were held for the three cases.  For ease of reading, we refer to documents that were filed in the singular, even though actually a particular document was filed in each case.

[3] We note that K.K.E. filed an initial brief in support of her appeal.  However, she did not file any reply brief to either the State or the guardian *ad litem's* brief.  While we could deem K.K.E.'s failure to respond to the arguments presented by the State and the guardian *ad litem* as concessions and resolve the appeal on that basis, *see United Co-op. v. Frontier FS Co-op.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (stating that the failure to refute a proposition asserted in a response brief may be taken as a concession), we have decided to address K.K.E.'s appeal on its merits.

[4] J.D.P is the father of A.C.P. and T.H. is the father of Z.H. and R.R.H.  We have only included facts relating to the fathers if necessary for clarity.

We note that initially the guardian *ad litem's* brief refers to the child born on December 14, 2014, as R.K. not R.R.H.  We attribute this to typographic errors and infer that the brief is referring to R.R.H. consistently.

¶3 K.K.E. has a history of Child Protective Services (CPS) referrals beginning in 2009. The 2009 referral alleged neglect of A.C.P.; an ongoing domestic violence relationship with T.H. where K.K.E., A.C.P., and Z.H. were reportedly physically abused by T.H.; a filthy home; and a report that A.C.P. was being physically abused.

¶4 In November 2013, CPS received a referral that Z.H., age five, disclosed that T.H. sexually assaulted her. The same referral also included information that A.C.P. told the reporter that T.H. put A.C.P.'s finger in her and that when A.C.P. told K.K.E. about the incident, K.K.E. "whooped" A.C.P. CPS notified K.K.E. about Z.H. and A.C.P.'s disclosures, but K.K.E. did not go to the Child Protection Center for their forensic interviews and she refused to consent to physical exams of the children. During the November 22, 2013 forensic interview, Z.H. told police that she "had sex with [T.H.]" and that A.C.P. told her that "I had sex with [T.H.]" and that it is a good thing to have sex with him. When K.K.E. learned about these disclosures, she refused to consent to allow A.C.P. and Z.H. to have sexual abuse exams.

¶5 After the forensic interviews, an initial assessment social worker met with K.K.E. and T.H. K.K.E. stated that at the time she was struggling with depression and taking medication for back pain. K.K.E.'s medical records indicated that she was diagnosed with major depressive disorder with psychotic features, suicidality, homicidality, schizoaffective disorder, rule out posttraumatic stress disorder, and anxiety disorder. K.K.E. also reported hearing voices telling her to kill herself, and that she had thoughts of killing T.H., but she did not want to go to jail.

¶6     In November 2013, both A.C.P. and Z.H. had physical examinations at the Child Protection Center.  A.C.P.'s exam showed that she had multiple healed injuries on her body.  During the exam, she stated multiple times that the injuries were from K.K.E. and T.H. "whooping" her with a belt.  The medical staff at the Child Protective Center concluded that A.C.P.'s injuries in conjunction with A.C.P.'s statements were "diagnostic for child physical abuse."  During Z.H.'s exam, she disclosed penis to vagina contact by T.H.  Z.H. also had numerous old healed injuries.

¶7     On December 6, 2013, at the conclusion of the initial assessment investigation, A.C.P. and Z.H. were taken into temporary physical custody and on December 10, 2013, the trial court signed temporary physical custody orders for A.C.P. and Z.H. placing them outside the home.  The basis for the temporary physical custody orders was that T.H. had engaged in a domestic violence incident with K.K.E. and in sexual and physical abuse of both children.

¶8     On April 29, 2014, A.C.P. was found to be a child in need of protective services (CHIPS).  The trial court entered a dispositional order setting conditions for the return of A.C.P. and continuing her placement outside of the home.  The conditions for the return of A.C.P. included requirements that K.K.E. have a psychological evaluation; participate in family therapy and individual therapy with domestic violence and anger management components; demonstrate an understanding of sexual abuse, her protective role for the children, and attend therapy, as needed, with A.C.P. to address sexual abuse; comply with all mental health recommendations; and demonstrate appropriate parenting skills on a daily basis.

¶9      On May 8, 2014, the trial court made a CHIPS finding as to Z.H. and it subsequently entered a dispositional order setting conditions for her return. The conditions for return included that K.K.E. demonstrate an understanding of sexual abuse; demonstrate an understanding of her protective role for the children; attend therapy with Z.H. to address sexual abuse; demonstrate an understanding of the harmfulness of her being in an abusive domestic relationship and its effect on her children; engage in individual and family therapy with domestic violence and anger management components; and demonstrate her daily ability to properly parent Z.H.

¶10     On July 2, 2015, A.C.P. was returned to K.K.E.'s home. Z.H. continued to be placed outside of the home, and on August 28, 2015, Z.H.'s dispositional order was extended until September 9, 2016.

¶11     On September 21, 2015, K.K.E. called the ongoing case manager and reported that she locked herself in a room after T.H. choked her and that A.C.P. had witnessed him choke her. The case manager remained on the phone with K.K.E. until the police arrived and arrested T.H. The case manager advised K.K.E. and T.H. that they should not have any contact with each other, including texts, while the investigation was ongoing. The workers also implemented a protective plan with relatives and attempted to again connect K.K.E. with domestic violence services and housing resources.

¶12     On October 1, 2015, A.C.P. and R.R.H. were taken into temporary physical custody because of K.K.E.'s auditory hallucinations, her untreated mental health problems, and ongoing domestic violence between K.K.E. and T.H.

5

Thereafter, the non-secure custody orders for A.C.P. and R.R.H. remained in place and were extended.

¶13    On March 23, 2016, the trial court made a CHIPS finding for R.R.H. The trial court then entered a dispositional order setting conditions for R.R.H.'s return requiring that K.K.E. control her mental health, commit no crimes, allow no violence in her home or in front of R.R.H., and provide proper parenting to R.R.H.

¶14    On July 6, 2016, the State filed a petition to terminate K.K.E.'s parental rights to A.C.P. and Z.H. on the grounds of CHIPS and failure to assume parental responsibility.[5]  At a hearing on September 12, 2016, the State's petition with respect to A.C.P. and Z.H. was scheduled for a jury trial on December 12, 2016, on the grounds phase.  That trial date was later adjourned to April 3, 2017.

¶15    On November 28, 2016, the State filed a petition to terminate K.K.E.'s parental rights as to R.R.H. on the ground of failure to assume parental responsibility.  At the initial appearance on December 6, 2016, K.K.E. requested a jury trial on the ground phase as to R.R.H.  The trial court then granted the State's request for a joint grounds phase trial for the three children.

¶16    On April 3, 2017, the ongoing case manager filed three Court Reports for Termination of Parental Rights, one for each child.  The reports

---

[5] Wisconsin has a two-part statutory procedure for an involuntary TPR.  ***Steven V. v. Kelley H.***, 2004 WI 47, ¶24, 271 Wis. 2d 1, 678 N.W.2d 856.  In the grounds phase, the petitioner must prove by clear and convincing evidence that at least one of the twelve grounds enumerated in WIS. STAT. § 48.415 exists.  *See* WIS. STAT. § 48.31(1); ***Steven V.***, 271 Wis. 2d 1, ¶¶24-25.  In the dispositional phase, the court must decide if it is in the child's best interest that the parent's rights be permanently extinguished.  *See* WIS. STAT. § 48.426(2); ***Steven V.***, 271 Wis. 2d 1, ¶27.

addressed the goals/conditions set for the return of the children to the home. Condition one goal one was that K.K.E. demonstrate "an understanding of appropriate parenting by utilizing skills to provide for her children's needs on a daily basis; examples include demonstrating age appropriate parenting and discipline techniques, having successful, consistent visits with her children and a safe home environment." The report states that visitation between K.K.E. and A.C.P. was fully supervised because K.K.E. was not consistent with visitation on a weekly basis. Visits went from twice a week to once per week due to the number visits that K.K.E. missed. On numerous visits K.K.E. had to be reminded to have age appropriate conversations with A.C.P. She would tell A.C.P. about plans to move out of state and on one occasion told her to stop crying or she would leave the visit because "she was not in the mood." The report also notes that the visits are not in the home setting because K.K.E. stated that T.H. sells drugs from the home. The case manager concluded that K.K.E.'s judgment about who was safe around the children was "not appropriate for a[n] in home visit."

¶17    The report further states that K.K.E. missed plan of care meetings and medication management appointments. K.K.E. told the case manager that she does not know the children's mental health diagnosis and what they mean. For example, the case worker stated A.C.P.'s doctor ordered that she not have sugar after four p.m. due to her epilepsy, but K.K.E. gave A.C.P. sugar on numerous visits after that time. The report also states that K.K.E. told a previous case manager that she was beginning to doubt whether she could meet her daughters' mental health needs.

¶18    The report further states that K.K.E. admitted that she believes that T.H. sexually abused A.C.P., but she continued to reside with him. One of the

conditions was that K.K.E. demonstrate an ability and willingness to provide a safe level of care for the children. However, the report states that K.K.E. told the case manager that she was in a domestically violent relationship and had started the process of obtaining a restraining order, but then did not follow through. It also states that K.K.E. was engaged in therapy, but was not taking medication despite previously reporting hallucinations. K.K.E. told the case manager that she did not want her daughters growing up witnessing domestic violence, but had not taken action to end the long-term relationship with T.H., which K.K.E. described as physically and emotionally abusive. The case manager concluded that "[t]he children have spent a substantial portion of their lives in out of home care as a result of [K.K.E.'s] in[]ability and/or [un]willingness to adequately address and/or set aside her own needs for the sake of her children."

¶19    On the jury trial date, K.K.E.'s trial counsel advised the trial court that K.K.E. wanted to plead no-contest to the CHIPS ground for A.C.P. and Z.H. and to the failure to assume parental responsibility ground for R.R.H. The trial court engaged in a colloquy with K.K.E and accepted her plea. The trial court also admitted into evidence certified records of the underlying CHIPS proceedings and heard the case manager's summary of the underlying facts. Based upon the testimony and evidence presented, the trial court found that the State had established the no-contest grounds by clear and convincing evidence, found K.K.E. unfit to parent the children, and adjourned the matter for a contested dispositional hearing.

¶20    On January 18, 2018, the trial court presided over the contested dispositional hearing. On February 27, 2018, the trial court rendered an oral decision holding that it was in the best interests of each child to terminate K.K.E.'s

parental rights to them. The trial court subsequently issued separate written orders terminating K.K.E.'s parental rights to each of the children.

¶21 This appeal follows. We refer to additional facts in our discussion.

## DISCUSSION

¶22 K.K.E. argues that based on the trial court's factual findings, the only reasonable conclusion is that the termination of K.K.E.'s parental rights was not in the best interests of A.C.P., Z.H., or R.R.H. and, therefore, the trial court erroneously exercised its discretion when it terminated her parental rights to them.

### I. Applicable law and the standard of review

¶23 At the dispositional phase of a termination of parental rights proceeding, the trial court must determine whether it is in the child's best interests to terminate parental rights. *See* WIS. STAT. § 48.426(2); *Steven V. v. Kelley H.*, 2004 WI 47, ¶27, 271 Wis. 2d 1, 678 N.W.2d 856. At a minimum, six factors set forth in WIS. STAT. § 48.426(3) must be considered by the trial court in deciding what is in the child's best interests. *See Steven V.*, 271 Wis. 2d 1, ¶27.

¶24 Ultimately, the decision whether or not to terminate parental rights is a matter within the trial court's discretion. *State v. Margaret H.*, 2000 WI 42, ¶27, 234 Wis. 2d 606, 610 N.W.2d 475. We will uphold the trial court's decision to terminate parental rights "if there is a proper exercise of discretion." *See id.*, ¶32. A trial court "properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and using a demonstrated rational process reaches a conclusion that a reasonable judge could reach." *Dane Cty. DHS v. Mable K.*, 2013 WI 28, ¶39, 346 Wis. 2d 396, 828 N.W.2d 198. The trial court is

"the ultimate and final arbiter of the credibility of witnesses," and we must accept the trial court's credibility determination. *See **Kimberly Area Sch. Dist. v. Zdanovec***, 222 Wis. 2d 27, 50, 586 N.W.2d 41 (Ct. App. 1998). We will not set aside the court's underlying factual findings unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2).

¶25    In the trial court's decision making process, "the best interests of the child[ren] is the paramount consideration[.]" ***Margaret H.***, 234 Wis. 2d 606, ¶33. To establish this, the trial court should reference the factors set forth in WIS. STAT. § 48.426(3), and any other factors it relied upon in explaining, on the record, the basis for the disposition. ***Sheboygan Cty. DHHS v. Julie A.B.***, 2002 WI 95, ¶30, 255 Wis. 2d 170, 648 N.W.2d 402. The factors set forth in § 48.426(3) include:

> (a) The likelihood of the child's adoption after termination.
>
> (b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.
>
> (c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.
>
> (d) The wishes of the child.
>
> (e) The duration of the separation of the parent from the child.
>
> (f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

10

**II.**   **The trial court properly exercised its discretion when it determined that termination of K.K.E.'s parental rights was in the best interest of A.C.P., Z.H., and R.R.H.**

¶26   When rendering its decision, the trial court noted that it would be considering all of the testimony, exhibits, and court reports previously filed. Additionally, the trial court stated that it would consider all of that evidence in light of the factors set forth in WIS. STAT. § 48.426(3). The trial court also noted that the factors are not exhaustive, "but they are meant to guide the decision that [the court] make[s] regarding what's in the children's best interest."

¶27   K.K.E. does not challenge the trial court's factual findings and, she concedes that the trial court discussed the six required statutory factors. Rather, with the exception of the wishes of each child, K.K.E. disagrees with the weight that the trial court attached to each of these factors and the underlying facts. We address each factor and K.K.E's argument pertaining to each factor.

*Likelihood of adoption*

¶28   The trial court first determined that there was a "high" likelihood that each child would be adopted upon the termination of K.K.E's parental rights. A.C.P. and R.R.H. were in the same foster home, the foster parent had been approved for adoption, and it was very likely that the foster parent would adopt the two girls if K.K.E.'s parental rights were terminated.

¶29   The trial court stated that Z.H.'s situation was more complicated, noting that Z.H.'s foster mother had health issues, but she had been licensed and was likely to be approved to adopt Z.H. Z.H. had been in her home for nearly four years and she had provided a "very stable" home for Z.H.

11

¶30      K.K.E. argues that A.C.P. and Z.H. could be more difficult to place for adoption if their current adoptive resources fell through, because A.C.P. has epilepsy, and she and Z.H. are older and have mental health issues.  We first note that K.K.E.'s argument is based on a possible occurrence, not an actuality.  Next, we note that the trial court found that the foster parent was committed to adopting A.C.P. and R.R.H.  Furthermore, K.K.E.'s argument does not take into account the trial court's specific finding that A.C.P. had made significant improvements in her mental health due to the care provided by her foster parent.  Furthermore, during the one and one-half years she had lived with the foster parent, A.C.P. had no epileptic seizures.

¶31      With respect to Z.H., who had lived four years in the foster home, her foster parent testified that she loved Z.H.  The trial court also found that the foster parent was managing Z.H.'s special needs and was committed to adopting Z.H.  Thus, K.K.E.'s argument is speculative and is not supported by the trial court's findings or the record.

### Ages and health of the child

¶32      The trial court next discussed the ages and the health of each child. It concluded that, despite their different situations, the ages and health of all three girls weighed in favor of termination of parental rights.  It noted that A.C.P. was eight years old when the most recent removal had occurred.  In the subsequent two years that A.C.P. had lived with the foster parent, her mental health had "improved significantly" and her epilepsy had been handled well, which the trial court attributed to the "stable and supportive placement."  As to Z.H., now nine and one-half years old, who had been removed from the parental home when she was five,

the trial court noted that she had significant mental health issues including aggression and impulsivity, with the latter being handled well by the foster parent. The trial court stated that it was not clear whether K.K.E. would have the knowledge and the ability to care full time for Z.H. and her special needs. With respect to R.R.H., then three years old, who was removed from the home when she was ten months old, the trial court observed that she was very adoptable and probably had no memory of living with her parents.

¶33    K.K.E. argues that the ages of the children weighed against termination of parental rights because their ages dovetailed with their substantial emotional bonds with her, and that the two older children would be more difficult to place for adoption than an infant. As will be explained in greater detail, the substantial emotional bonds between K.K.E. and each of the children were clearly recognized by the trial court when it stated that such factor "weigh[ed] at least to some degree against [the] termination of parental rights." As stated, there was an adoptive home for A.C.P. and an adoptive home for Z.H. was "very likely" and their respective foster parents were eager for the adoptions.

¶34    Regarding this factor, K.K.E. is clearly challenging the weight that the trial court gave to the children's ages and health. However, our review of the record establishes that the trial court gave adequate consideration to and weight to this factor. *See **Margaret H.***, 234 Wis. 2d 606, ¶35 (stating that it is within the province of the trial court to determine where the best interests of the child lie, provided that the record reflects adequate consideration of and weight to each factor).

13

*Substantial relationships with parents and other family members and harm from severance*

¶35 The trial court then addressed each child's relationship with K.K.E. and other family members and whether it would be harmful to them to sever the relationships. The trial court found that A.C.P. and R.R.H. were placed together and that their substantial relationship would continue after adoption if K.K.E.'s parental rights were terminated. The trial court also found that Z.H. did not have a substantial relationship with either A.C.P. or R.R.H. However, that situation was, at least partly, because Z.H.'s high needs affected her ability to interact appropriately with her siblings. Thus, under the circumstances, the trial court concluded that severance of the relationship between Z.H. and her two siblings would not be harmful to them.

¶36 The trial court also noted that, with the exception of A.C.P.'s "substantial relationship" with her *paternal* grandmother,[6] there was little other evidence about relationships between any of the children and other extended family members. The trial court further found that the three girls had a "substantial relationship" with K.K.E. and that to some degree it would be "difficult" and "harmful to the girls to sever the legal relationships with their parents." Thus, the trial court concluded that the factor weighed "at least to some degree" against the termination of parental rights.

---

[6] We refer to the *paternal* grandmother, even though in its oral decision the trial court stated that A.C.P. had a "substantial relationship with her maternal grandmother." At the disposition hearing, A.C.P.'s foster mother and the case manager testified about A.C.P.'s relationship with her *paternal* grandmother. There was no testimony about a maternal grandmother.

¶37  Regarding this factor, K.K.E. clearly is challenging the weight the trial court afforded to the harm caused by termination.  She argues that the trial court was "wrong in affording minimal weight" to the factor and should have found that it weighed "significantly against termination."  However, the trial court is not required to afford greater weight to any particular factors identified in WIS. STAT. § 48.426(3).  *See **Margaret H.***, 234 Wis. 2d 606, ¶¶29, 35.  Rather, the factors that the trial court considers "must be calibrated to the prevailing standard," the child's best interests.  ***Julie A.B.***, 255 Wis. 2d 170, ¶30.  K.K.E. has not shown that the trial court failed in its duty to focus on each child's best interests.

### The wishes of the child

¶38  The trial court next addressed each child's wishes.  Noting that A.C.P. had stated that she wanted to stay with the foster mother, the trial court stated that it understood that A.C.P. was comfortable and she felt safe and secure there.  Regardless, the trial court found the factor was neutral as to all three children because Z.H. and R.R.H. were too young to intelligently express their opinions and it questioned if A.C.P., the oldest child, was able to understand the impact of terminating her parents' rights.  K.K.E. has not presented an argument regarding this factor.

### Duration of the separation from the parents

¶39  The trial court next addressed how long each child had been separated from the parents.  A.C.P had been placed outside the parental home for a total of a third of her life—most recently for two years, and previously for approximately one and one-half years.  Z.H had lived outside of the home for over

15

four years—almost half her life. R.R.H. had been outside the home for about two years which itself was not a long time, but for her it was "a substantial majority" of her life. While the trial court noted that each of the children had visitation with K.K.E., it concluded that the duration of the separation from K.K.E. weighed in favor of the termination of K.K.E.'s parental rights.[7]

### *The ability of the child to enter into a stable relationship if parental rights were terminated*

¶40    The trial court next considered whether each child would be able enter a more stable and permanent relationship. The trial court noted that K.K.E. and T.H. had been "very significantly" present in the girls' lives and that J.D.P. and his family had been present in the life of A.C.P. Additionally, the trial court noted that K.K.E. had made real strides in her parenting skills and made very significant strides in her mental health by actively participating in therapy, and that possibly sometime in the future K.K.E. "would be more stable and more able

---

[7] Although the transcript of the dispositional hearing reflects that the trial court stated that the duration of the period of time that R.R.H. was out of the home weighed *against* the termination of parental rights in "*her case as well*," the context of the trial court's statements demonstrate that it reached the same conclusion for both Z.H. and R.R.H.—the duration factor weighed in favor of the termination of parental rights. The trial court stated:

> [Z.H. has] been placed out of the home for over four years and that's almost half of her life time at this time, but I do find that that's a factor that weighs in favor of termination of parental rights. *And similarly, [R.R.H. has]* been out of the home for about two years, that's not such a long period of time in total, but *it is about two-thirds of her lifetime.* It's really a substantial majority of her lifetime. And although she's also had regular visits with her parents, that's a factor that weighs against termination of parental rights in her case *as well.*

(Emphasis added.) Thus, the trial court concluded that the duration factor weighed in favor of the termination of K.K.E.'s parental rights to R.R.H. and Z.H.

to care for the girls."[8]  However, the trial court also noted that K.K.E. and T.H. had not substantially addressed the domestic violence in their relationship which continued to present a safety concern for all three girls.  The trial court acknowledged that K.K.E. had struggled to leave the relationship and, although there were practical concerns that made it difficult, she also struggled with the separation itself.

¶41     The trial court found that the foster parents would be able to provide a safe, permanent, stable, and loving homes for the children.  It found that A.C.P. and R.R.H.'s foster home was excellent, met the girls' needs well, the two girls had bonded to all the older children in the home, and that the foster mother was approved for adoption.

¶42     With respect to Z.H.'s foster home, the trial court found that it was a wonderful home, the foster parent had taken very good care of Z.H., and she also had worked to maintain a relationship with K.K.E.  The trial court noted that the foster parent had some health and financial challenges, but it was clear that the

---

[8] K.K.E. argues that the strides she made in parenting weighed against termination, not in favor of it.  The improvement in K.K.E.'s ability to parent was clearly recognized by the trial court as a favorable fact.  However, that was just one part of the trial court's consideration of the sixth factor; that is, the ability of the child to enter into a stable relationship if parental rights were terminated.  Moreover, the trial court also found that despite the strides that K.K.E. had made, "it's not clear when [K.K.E.] would actually be in a position to have the girls come live with her permanently."

parent would be licensed and approved for adoption and that it was very likely that the foster parent would be able to provide a permanent home for Z.H.[9]

¶43     Thus, the trial court concluded that the ability of each child to enter into a stable relationship if K.K.E.'s parental rights were terminated favored the termination of her parental rights.

¶44     The trial court ended its analysis of the six factors by stating that it had concluded that it was in the best interests of each child that K.K.E.'s parental rights be terminated. The guardian *ad litem* had also opined that termination of parental rights was in the best interest of each child.

*Summary*

¶45     The trial court's weighing of the statutory factors in WIS. STAT. § 48.426 is inherent in its exercise of discretion. What K.K.E. actually contests is the trial court's conclusion and reasoning based on its consideration of the relevant factors. Essentially, K.K.E. disagrees with the way the trial court weighed the relevant factors.

¶46     K.K.E. does not challenge the trial court's factual findings and she concedes that the trial court considered and analyzed the six required statutory factors. She also failed to demonstrate that the trial court did not apply a proper standard of law or use a demonstrated rational process to reach a conclusion that a

---

[9] K.K.E. also argues that the trial court's findings regarding the potential adoptive resource for Z.H. "depicted not permanence and stability … but uncertainty." K.K.E. is merely disagreeing with the trial court's findings of fact. We conclude that the trial court thoroughly and carefully considered the facts regarding Z.H.'s foster home.

reasonable judge could reach.  *See **Mable K.***, 346 Wis. 2d 396, ¶39.  Rather, K.K.E. is challenging the weight that the trial court afforded to each of the required factors in determining the harm caused by the termination of her parental rights.  However, the weight afforded to a particular factor is left to the trial court's discretion so long as it satisfied the requisites for the exercise of its discretion.  *See **Margaret H.***, 234 Wis. 2d 606, ¶¶29, 35.  Based on our review of the trial court's findings, its application of the relevant law, and its demonstrated rational process, we conclude that the trial court properly exercised its discretion deciding that termination of K.K.E.'s parental rights was in the best interests of each daughter.  *See **Mable K.***, 346 Wis. 2d 396, ¶39.  Therefore, we affirm.

## CONCLUSION

¶47    In sum, we conclude that the trial court reasonably exercised its discretion in determining that the termination of K.K.E.'s parental rights was in the best interests of A.C.P., Z.H., and R.R.H., *see **Margaret H.***, 234 Wis. 2d 606, ¶¶32-33.  Therefore, we affirm the trial court's orders.

*By the Court.*—Orders affirmed.

This opinion will not be published.  WIS. STAT. RULE 809.23(1)(b)(4).